UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AMBER LYNN, an infant under the age of 18,
by her m/n/g JULIE B. and JULIE B. individually,

                              Plaintiffs,

        v.                                    03-CV-1333

ST. ANNE INSTITUTE, CHARLES GRAHAM
individually and in his official capacity, RICHARD
RICCIO individually and in his official capacity,
ELECIA RATTRAY individually and in her official capacity,
IVY GIBSON individually and in her official capacity,
DOUGLAS WILSON individually and in his official capacity,
CYNTHIA LANDRY individually and in her official capacity,
TERRY BOLAND individually and in her official capacity,
ANNE RYAN individually and in her official capacity,
KELLY POTTS individually and in her official capacity,
"JANE" O'KEEFE individually and in her official capacity,
MARY MULCHY individually and in her official capacity,
THE COUNTY OF GREENE, GREENE COUNTY
DIRECTOR OF DEPARTMENT OF SOCIAL SERVICES
CAROL WALLACE individually and in her official capacity,
GREENE COUNTY COMMISSION OF THE DEPARTMENT
OF FAMILY AND CHILDREN'S SERVICES, MARGARET
GOODE individually and in her official capacity, SUZANNE
PAULINO individually and in her official capacity,
JANE DOE 1 individually and in her official capacity,
SHARON REGAN individually and in her official capacity,
JOHN JOHNSON COMMISSIONER OF THE DEPARTMENT
OF SOCIAL SERVICES OF THE STATE OF NEW YORK
individually and in his official capacity, JANE DOE 2
individually and in her official capacity,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiffs Amber Lynn ("Amber") and Julie B. commenced the instant action asserting causes of action for violations of their constitutional rights and various state law causes of action arising out of Amber's placement at the St. Anne Institute ("St. Anne"). Presently before the Court are motions for summary judgment pursuant to Fed. R. Civ. P. 56 by the Greene County Defendants[1] and the St. Anne Defendants[2] seeking dismissal of the Complaint in its entirety.

## I.    FACTS

On July 24, 2000, Defendant Greene County Department of Social Services ("GCDSS") received a report that Amber was being sexually abused by her mother's boyfriend.[3]  Plaintiff's mother did not believe Amber's allegations.  On July 25, 2000, Defendant GCDSS Child Protective Services Case Worker Suzanne Paolino investigated the report and determined that Amber's allegations were founded.  That same day, Plaintiff's mother consented to the temporary placement of Amber with the GCDSS.  Amber was immediately removed from her mother's home by the GCDSS and placed in foster care at the home of Mary Francis and Robert Young.  On July 31, 2000, Paolino filed a neglect and abuse petition in Greene County Family Court against Amber's mother.  On July 31, 2000, the Greene County Family Court issued an order finding that it was necessary to remove

---

[1] The Greene County Defendants include: the County of Greene, Kelly Potts, Margaret Goode, Suzanne Paolino, Carol Wallace, and Sharon Regan.

[2] The St. Anne Defendants include: St. Anne Institute, Richard Riccio, Elecia Rattray, Ivy Gibson, Douglas Wilson, Cynthia Landry, Terry Boland, Anne Ryan, Jane O'Keefe, and Mary Mulchy.

[3] Julie B. is Amber's mother.

Amber from the home because: (1) she had been sexually abused since the age of nine;[4] (2) the mother, despite being informed of the abuse, failed to take appropriate action; and (3) her mother smoked marijuana in Amber's presence.  The Family Court ordered that Amber be temporarily placed in the custody of the GCDSS for placement in a certified home pending further proceedings.

On October 1, 2000, Amber disappeared from the Young home.  Amber returned that same day, making allegations of inappropriate conduct by Mr. Young.[5]  It was then determined that Amber would not remain in the Young home.  On October 2, 2000, Amber was placed at the Family House of Woodstock.  On October 10, 2000, Amber disappeared from the Family House of Woodstock.  The Family House of Woodstock discharged Amber for having run away.  Paolino and Defendant Sharon Regan then determined to place Amber at the Defendant St. Anne Institute.  St. Anne was chosen because Amber had accused her mother's boyfriend of sexual abuse and there was alcohol and drug abuse in Amber's family and St. Anne offered alcohol, drug, and sex abuse programs.

On October 13, 2000, the GCDSS filed a petition requesting that Amber be adjudicated as a person in need of supervision ("PINS").  On October 27, 2000, Amber went absent without leave from St. Anne.  On November 6, 2000, the Greene County Family Court held a hearing concerning the PINS petition.  On November 8, 2000, the Greene County Family Court issued an order as follows:

---

[4] At the time, Amber was fourteen years old.

[5] Defendants allege that Amber accused Young of sexual abuse.  Plaintiffs deny this assertion and contend that Amber stated that she felt uncomfortable around Mr. Young, including the way that he touched her.

> [Amber is] a person in need of supervision who, while under sixteen years of age (is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority), and on the further ground that [Amber Lynn] requires supervision or treatment; and it is therefore . . . Ordered, that this proceeding be and the same hereby is disposed and [Amber Lynn] be and hereby is placed for a period of one year in the custody of the Commissioner of Social Services, for placement as the Department sees fit, subject to further orders of this Court. . . .

In November 2000, Defendant Kelly Potts became Amber's case worker.  On November 30, 2000, the Greene County Family Court issued a finding of neglect against Amber's mother.  The Court found:

> that facts sufficient to sustain the petition herein have been established that: Julie B did neglect said children by smoking marijuana in the presence of the children and it is hereby ADJUDGED that the above named children are neglected children as defined in . . . the Family Court Act . . . .

From October 13, 2000 through December 4, 2000, Amber resided in Nazareth Hall at St. Anne.  On December 4, 2000, Amber was placed in Hubbard Hall at St. Anne.  Amber met Defendant Charles Graham, who was then a St. Anne employee, while in Hubbard Hall.

On March 21, 2001, Amber's mother's boyfriend, Robert Twiss, pleaded guilty to Endangering the Welfare of a Child (smoking marijuana in the presence of Amber and her siblings) in full satisfaction of the charge of Second Degree Sexual Abuse.  On March 25, 2001, the Greene County Family Court issued a finding of neglect against Twiss.

On July 1, 2001, the GCDSS and St. Anne's Institute entered into and extended their "Agreement for Purchase of Foster Care for Children."  Throughout 2001, St. Anne was licensed by the New York State Office of Children and Family Services ("OCFS") and the State of New York Health and Educational Departments.  St. Anne was a residential facility accredited by the OCFS.

In September 2001, St. Anne employee Elecia Rattray came into possession of a diary belonging to one of the student residents, Carla S.  The diary recounted sexual relations between Carla S. and Graham.  When Rattray confronted Carla S. regarding the veracity of the statements in the diary, Carla stated that they were not true.  Rattray Dep. at 145.[6]  Rattray similarly spoke to Graham who also denied the statements in the diary.  Id. at 146.  It does not appear that any further action was taken with respect to this incident.

On October 2, 2001, the GCDSS filed a petition to extend Amber's placement at St. Anne for an additional one year.  GCDSS also requested a permanency hearing.  The GCDSS filed an affidavit in support of the petition.  The Greene County Family Court considered the petition on October 29, 2001.  On February 21, 2002, the Greene County Family Court issued an order extending Amber's placement at St. Anne for one year.

In or about late November or early December 2001, Amber commenced a sexual relationship with Charles Graham.  Amber and Graham engaged in sexual intercourse approximately ten times.  It appears that, although Graham clearly abused his position of trust with respect to Amber, the relationship was voluntary to the extent that Amber did not object to Graham's advances, she willingly participated in the sexual activities, and she endeavored to keep their relations secret.[7]  Amber testified at deposition that nobody from

---

[6] There is a factual dispute whether Graham was present when Carla S. was confronted by Rattray.

[7] In her opposition papers, Amber denies this allegation contending that, at the time of her relationship with Graham, she was a minor and, therefore, legally unable to consent to sexual relations. Plaintiffs repeatedly characterize Amber as having been raped and sexually abused. While Plaintiffs' characterizations may be legally true for purposes of criminal liability, the point remains that Amber was a willing participate in sexual relations with Graham and in keeping their relations secret.  At deposition Amber was asked the following questions and gave the following answers:

Q:     And what happened during that first contact?

(continued...)

———————————————

[7](...continued)

A:     We – Charles told me to come with him and we went to the back stairway. . . . [H]e put a pillow on the floor and told me to lay down on it.  He told me to take off my pants and he pulled his pants down probably around his knees . . .  and we had sexual intercourse. . . .

Q:     Why did you go with Charles Graham?  Why did you go to the back stairway?

A:     I don't know.  I just went with him.  I knew what was going to happen. . . . It was — it was kind of planned out like he was waiting for a time when we would be able to do it and the time arose.

* * * *

Q:     Before the time [in the back stairway] . . . had there been any physical contact between you and Charles Graham?

A:     Yes . . . It was right near Thanksgiving maybe, before or after. . . . [T]he first intercourse [was upstairs in the back stairway].

* * * *

Q:     Could you tell me when your first physical contact, first type of touching occurred between the two of you?

A:     Yes.  It was right around Thanksgiving. . . .Me and Charles were roughhousing.  We were like running around the unit, as usual, and he grabbed me and held me in a way that he has never done before and I felt vibes from it, and he – I was thinking to myself, okay, and he did it a second time, and then the third time he did it, he grabbed me and he held me, I responded to it, and I kissed his neck.

* * * *

Q:     Did you consent to the sexual relations with Charles Graham?

A:     Yes.

* * * *

Q:     Did you enjoy it?

A:     Yes and no.

Lynn Dep. at pp. 137-142.  Amber also testified that she was disappointed to hear that St. Anne was considering placing cameras in the facility because it would interfere with her relationship with Graham. Id. at 274.

On the other hand, Amber also testified that she felt a little uncomfortable with the situation, that she did not report the sexual interaction for fear of being mocked by the other girls and because she did not think that anyone would believe her, and that she felt "kind of obligated [to have sexual relations with Graham] because of the situation being that I was kind of there by myself, and — I don't know.  I guess I felt kind of obligated in the situation."  Id. at 194.

        Thus, although Graham abused his position of trust and took advantage of Amber in light of her

(continued...)

- 6 -

Greene County was aware of her relationship with Graham.

In April 2002, Potts (Amber's case worker) first learned of Amber and Graham's sexual relationship.  Potts learned of this from Amber's mother.[8]  The GCDSS then began making arrangements to have Amber removed from St. Anne.  Amber was not actually removed from St. Anne until approximately five days after Potts first learned of the sexual relations.[9]  OCFS and the police recommended that Amber remain at St. Anne during this period of time because they were fearful that, if Amber was allowed to go home, she would run away from her mother's home to be with Graham or she would alert Graham to the ongoing investigation.

On April 26, 2002, Amber was removed from St. Anne and returned to her mother's home.  On November 6, 2002, Amber was discharged from the custody of the GCDSS.

The parties dispute whether, prior to the incident between Amber and Graham, there was more than one other known incident of inappropriate sexual contact between a St. Anne employee and a resident.  Plaintiffs contend that the other prior incident involved more than one victim.  Plaintiffs also contend that, prior to the Graham incident, Cleo Oliver sexually assaulted a St. Anne resident.  There also is testimony in the record concerning allegations of a principal inappropriately touching a student and that a reading teacher was

---

[7](...continued)
age and circumstances, Amber was not physically forced into sexual relations with Graham and otherwise consented to sexual relations with Graham.

Ultimately, it is irrelevant whether Amber's sexual contact with Graham is considered to be rape, sexual abuse, or consensual sexual relations.  As is relevant to this case, the undisputed facts are that Amber kept her relations with Graham secret and facilitated Graham's keeping their relationship secret.

[8] It is unclear how Amber's mother came to learn of Amber's relationship with Graham.

[9] Potts did not have independent authority to remove Amber from St. Anne.

counseled by St. Anne for inappropriately touching a student.  The Court will assume that Plaintiffs are correct and that these prior incidents did occur, although it does not appear that all of these prior incidents involved the degree of sexual contact at issue in this case.[10]

## II.    STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor.  Abramson v. Pataki, 278

_____

[10] After learning of the Graham's relations with Amber, the Greene County Defendants learned that Graham had had sexual contact with another St. Anne resident.

F.3d 93, 101 (2d Cir. 2002).  However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

**III.    DISCUSSION**

> **a.    Procedural Due Process, Fifth Amendment, Eighth Amendment, and 42 U.S.C. § 1981**

In her memorandum of law, Plaintiff withdraws her claims of a violation of her procedural due process rights and for violations of the Fifth and Eighth Amendments and 42 U.S.C. § 1981.  Accordingly, those claims are dismissed.

> **b.    Substantive Due Process**

The Greene County Defendants move to dismiss the substantive due process claims on the ground that they did not act with deliberate indifference to Amber's safety and well-being.  The Greene County Defendants argue that they placed Amber into a fully accredited facility (St. Anne) and they had no reason to know or believe that Graham or any other St. Anne staff presented a risk of harm to her.  The Greene County Defendants further contend that, upon being apprised of the situation, they took action to remove Amber from St. Anne, that there was no further contact with Amber and Graham, that Amber did not sustain any further sexual contact with employees of St. Anne, and that they offered counseling services to Amber.  Plaintiffs respond that the Greene County Defendants acted with deliberate indifference because they had little actual knowledge of Amber's living conditions, had no policy for reporting unsafe conditions (including sexual abuse), failed to

supervise activities at St. Anne, and failed to act on evidence of other sexual transgressions by Graham (*e.g.*, his relations with Carla S.).

The Second Circuit has held that "family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." Anthony v. City of New York, 339 F.3d 129, 142 (2d Cir. 2003); see Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999). To prevail on such a claim, Plaintiffs must demonstrate that their separation from one another was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Tenenbaum, 193 F.3d at 600.

To the extent Plaintiffs seek to recover under this theory, their Complaint must be dismissed. Amber's mother consented to the GCDSS taking temporary custody of Amber. A removal under such circumstances is not shocking, arbitrary or egregious. Moreover, considering the circumstances of the removal and continued retention of Amber, Plaintiffs fail to establish a substantive due process claim. It is undisputed that Amber was removed from the home only after she reported being sexually abused by her mother's boyfriend. Moreover, the GCDSS continued to retain Amber only after a court found that Amber had been sexually abused by her mother's boyfriend, that her mother did nothing to stop the abuse, and that her mother and her boyfriend smoked marijuana in Amber's presence. These facts presented ample basis for the GCDSS to remove Amber from her mother's home. Accordingly, the separation is not shocking, arbitrary or egregious. See Gottlieb v. County of Orange, 84 F.3d 511, 518-19 (2d Cir. 1996).

Plaintiffs also contend that the Greene County Defendants failed to protect Amber from harm by Graham.  "[A] state agency may be liable under the Due Process Clause for failing to protect children in their custody."  Phifer v. City of New York, 289 F.3d 49, 62 (2d Cir. 2002) (citing Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981)).  "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution."  Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141 (2d Cir. 1981).

> In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." [County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708 (1998)].  Lewis reaffirmed the principle that the Fourteenth Amendment is not a "font of tort law."  Id. at 848, 118 S. Ct. 1708.  It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.  The Lewis Court made it clear, for example, that "negligently inflicted harm is categorically beneath the threshold of constitutional due process."  Id. at 849, 118 S. Ct. 1708.

Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005).  "Determining whether the conscience is shocked by lesser levels of culpability than intentional infliction of physical harm requires [courts] to make 'closer calls.'"  Pena, 432 F.3d at 113 (quoting Lewis, 523 U.S. at 849, 118 S. Ct. 1708).  In situations where government officials are not required to make split-second determinations, deliberate indifference is enough to shock the conscience.  Pena, 432 F.3d at 113.  "[T]his mental state . . . requires proof that the defendant[s] focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk."  Id. (quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 n. 11 (10th Cir. 1992)).  Thus, to

succeed on her § 1983 claim for the nonfeasance of affirmative duties to those in its custody, Plaintiff must demonstrate the following two elements:

> (1) "the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest;" and (2) "the officials in charge of the agency being sued must have displayed a mental state of 'deliberate indifference' in order to 'meaningfully be terms culpable' under § 1983."

Tylena M. v. Heartshare Children's Servs., 390 F. Supp.2d 296, 302 (S.D.N.Y. 2005) (quoting Doe, 649 F.2d at 141).

Defendants contend that nothing they did, or failed to do, contributed to Graham's sexual relationship with Amber or reasonably could have detected that relationship.  In support of this contention, Defendants claim that, even though Amber was a minor, she was a willing participant in the sexual relations with Graham and that she and Graham worked together to secrete their sexually-related activities.  For example, Amber agreed to meet with Graham late at night and in secluded locations knowing that sexually-related contact was likely to occur.  Defendants further argue that they did have a policy requiring the reporting of suspected cases of abuse and maltreatment.

Plaintiffs respond that Defendants had a longstanding policy or practice that created or enhanced the conditions under which the risk of child abuse became foreseeable. In support of this claim, Plaintiffs contend that the Greene County Defendants had little or no personal knowledge of the conditions in which Amber was living, Amber's caseworker visited Amber only once, they had no other communications with Amber while she was housed at St. Anne, they had no policy to report unsafe conditions and/or sexual abuse of Amber, they failed to confirm that the information they received from St. Anne was accurate, and they did not have a policy requiring St. Anne to inform them of sexual abuse concerning wards of

other counties.  Plaintiffs then argue that "if [the Greene County Defendants] would have known that Charles Graham was having sexual relations with Carla S. [another student at St. Anne] the Plaintiff Amber Lynn would have been spared the sexual assaults that are at issue in this action."  Pl.'s Mem. of Law at 15.[11]  Plaintiffs continue to argue that "[i]f Greene County had made any effort to conduct investigations into sex abuse allegations or at the least a policy to compel St. Anne's to conduct . . . investigations and report the results back to Greene County, Charles Graham's conduct would have been discovered in September of 2001 before any of the sexual assaults of Amber occurred."  Id.

In support of their claims, Plaintiffs primarily rely on three cases:  Doe, 649 F.2d 134, Tylena M, 390 F. Supp.2d 296, and Prieto v. County of Orange, 1997 WL 399662 (S.D.N.Y. 1997).  In Doe, the child was regularly beaten and sexually abused by her foster father.  This occurred over a period of approximately five to six years before the child was removed from the home by the Catholic Home Bureau (the "Bureau"), the agency designated by the New York City Department of Social Services to arrange for the child's care.  Two years prior to the time the child was removed from the foster home, a psychiatrist concluded that the child was sexually involved with her foster father and recommended that the child be removed from the home.  The Bureau essentially ignored this report and its recommendations, deleted the allegations of sexual abuse from the psychiatrist's report, allowed the child to remain in the foster home, and did not file a child abuse report as required under state law.  Nearly two years later, the foster father advised the agency that he was planning to divorce his wife to marry his pregnant seventeen year old girlfriend.

---

[11] Referencing the page numbers in Plaintiff's memorandum of law has been made difficult by Plaintiff's failure to put page numbers therein - a violation of N.D.N.Y.L.R. 10.1(a).

Although this concerned Bureau employees, they did nothing for another month. Based on these facts, the Second Circuit concluded that "the causal link between the agency's alleged failure to supervise and the continuation of [the child's] abuse is clear. If the agency had investigated Anna's case with sufficient acuity and diligence to discovery the abuse, it would have been able to prevent further abuse by withdrawing her from the home." The Circuit further found that the Bureau's failure to report the abuse, as required by state law, was evidence of a deliberate indifference to the child's welfare.

Prieto, 1997 WL 399662, involved an autistic and mentally retarded child. Through the use of "facilitated communication" whereby the facilitator places her hands on the child's hand or arm and assists the child to touch letters on a keyboard, government employees believed the child to be communicating that she was having sexual intercourse with her father and mother. Governmental employees also were aware of a previous allegation of sexual abuse involving the child's parents. As a result, the child was removed from the home. The child ultimately was returned to her parents' home. The parents sued claiming, among other things, that the government employees were insufficiently trained in the technique of facilitated communication. The district court found triable issues of fact on this claim because there was evidence that the facilitated communications technique was unproven, difficult to administer, and that the government employees had received minimal training in its use. The court, therefore, concluded that a jury could conclude that the mishandling of this communications technique could result in an erroneous determination that a child was reporting sexual abuse, thereby causing an unwarranted removal of the child from the home.

Finally, Tylena M., 390 F. Supp.2d 296, involved a situation where children who were placed in a foster home were repeatedly beaten, sexually abused, and locked in closets for long periods of time.  In that case, the City of New York had a policy prohibiting city employees from visiting foster homes, speaking with foster parents, or having communications with the foster children.  The district court concluded that

> Although the City adopted procedures for generally evaluating the performance of foster care agencies and those agencies were subject to state regulations, the record before the Court raises a question of fact as to whether the City enacted adequate procedures by which to verify the completeness and accuracy of information provided to it by agencies about specific individual children in foster care. . . . A reasonable juror could interpret the absence of any means of the City going behind a contract agency's own representations, combined with a policy prohibiting employees responsible for oversight of such agencies from having direct contact with foster children and foster parents, to reflect indifference to the risk that foster children might be abused in their foster homes. . . .

Id. at 307.  The court continued to note that there was evidence of abuse that would have been reasonably discoverable by the City had it adequately supervised the foster care placement.  The court, therefore, held that "a reasonable juror could conclude from the evidence in the record . . . that the City's policy prohibiting direct contact with foster children, insofar as it precluded or discouraged reports of abuse that could have prompted remedial measures, was a 'substantial factor' leading to the continuation of the violations in this case." Id. at 309.

This case is significantly different from those cited above.  In both Doe and Tylena M., there was reasonably discoverable evidence of abuse.  In Doe, visual observations of the child, communications with the child, or paying attention to the psychiatric report that specifically concluded that there was sexual abuse would have revealed the abuse and enabled the governmental agency to take preventive action.  Similarly, in Tylena, there

existed "observable signs of . . . abuse that City workers could have detected had they had or been open to any direct contact with the children." Tylena, 390 F. Supp.2d at 308-09.  Thus, in those cases, the government agencies' policies (or lack of policies), including the failure to properly supervise the children, precluded the agencies from learning of the abuse and then taking action to prevent further abuse.

Here, by contrast, there is no evidence in the record from which it reasonably may be concluded that the Greene County Defendants knew, or reasonably should have known, of any sexual relations between Graham and Amber.  By Amber's own admission, her relationship with Graham was a secret and she did not disclose its existence to any St. Anne or Greene County employee prior to the time she was removed from St. Anne.  See Def.'s Ex. J at pp. 143-45, 190-91, 223 (admitting that she engaged in sexual acts with Graham in a secretive manner to prevent other people from being made aware of it), 274, 288 (admitting that she intended on keeping her relationship with Graham at secret from St. Anne staff), 346 ("I didn't want to tell anybody.  It was a big secret. . . .").  Plaintiffs fail to point to any reasonably observable signs that could have or would have alerted Defendants to the ongoing sexual relations between Amber and Graham.  Furthermore, there is evidence that the Greene County Defendants required St. Anne to comply with New York's statutory reporting requirements for suspected abuse or maltreatment.  See Def.'s Ex. K; N.Y. Soc. Serv. Law § 412, et seq.  (providing a reporting mechanism through which reports of abuse or maltreatment are made to a central registry, which information would then be relayed to the local child protective agencies).  Accordingly, these Defendants did have reporting policies in place.  Further, the record is devoid of any evidence that Amber, a St. Anne employee, a St. Anne resident, or anyone else, reported, attempted to report, or wanted to

report, any allegations or evidence of sexual abuse to the Greene County Defendants.
Because no report concerning Amber was made, or attempted to be made, it cannot be said
that any policy, or lack of policy, contributed to the situation between Amber and Graham.[12]

Plaintiffs argue that had the Greene County Defendants known about the sexual
relations between Carla S. and Graham, they would have been able to prevent any sexual
relations between Amber and Graham. Assuming this statement to be true, the fact of the
matter is that the Greene County Defendants did not know about the relations between Carla
S. and Graham until after they learned about Amber and Graham. Although St. Anne
employee Elecia Rattray had information concerning sexual relations between Graham and
Carla S.,[13] there is no evidence in the record that Rattray, or anyone else, provided any
information concerning Graham and Carla S. to the Greene County Defendants before the
relationship between Graham and Amber came to light. Plaintiffs similarly fail to present
sufficient evidence demonstrating that the Greene County Defendants should have known
about the Carla S./Graham situation. As previously noted, there is no evidence that the
Greene County Defendants did anything to prevent them from obtaining any such
information. There was a policy requiring the reporting of abuse and maltreatment in
accordance with state law. No report, however, was made. It appears that Rattray did not
report anything because Carla S. stated that the entries in her diary were false. Further, as
also discussed, there was no reasonably objective evidence available to the Greene County

---

[12] Once Defendants learned of the situation, the sexual relations between Graham and Amber
had ceased. There are no allegations of further sexual relations involving, or maltreatment of, Amber
after Defendants learned of her sexual relations with Graham.

[13] Graham ultimately pleaded guilty on charges relating to sexual activity with Carla S. Thus, in
hindsight, it is a known fact that Graham had sexual relations with Carla S. This level of certainty did not
exist, however, at the time of the incidents at issue here.

Defendants that should have spurned an independent investigation into St. Anne.  Although the Greene County Defendants can be said to have relied upon the non-reporting of any problems at St. Anne, unlike the <u>Doe</u> and <u>Tylena M.</u> cases, here, the Greene County Defendants did not close their eyes to the available information.  Government agencies are not held to a standard of omniscience.  Thus, even assuming Defendants were poorly trained, did not sufficiently visit Amber, failed to properly supervise Amber and her living conditions,[14] and did not have adequate reporting procedures, there is insufficient evidence upon which to conclude that such failures and/or omissions contributed to the denial of a constitutionally protected liberty interest.  Stated otherwise, there is insufficient evidence in the record from which the trier of fact could reasonably conclude that, had Defendants visited Amber more frequently, communicated with her more frequently, had better policies to report unsafe conditions or sexual abuse, or better investigated sexual abuse allegations, the Greene County Defendants would have been able to prevent further sexual contact between Amber and Graham.  To the contrary, the absence of objectively observable evidence (direct or circumstantial) of any sexual activity between Graham and St. Anne residents together with Graham and Amber's endeavors to keep those relations secret precluded Defendants from learning of the sexual relations and taking action to prevent further sexual contact.  It, therefore, cannot be said that Defendants' policies, failure to have policies, actions, or inactions were a substantial factor leading to the denial of a constitutionally protected liberty interest.

---

[14] There is evidence of some ongoing contact between the Greene County Defendants and Amber.  The extent of such ongoing contacts, however, is disputed.

For similar reasons, the Court further finds that there is insufficient evidence upon which a trier of fact could reasonably conclude that Defendants acted with deliberate indifference to Amber's safety.  Again, the evidence overwhelmingly demonstrates that Defendants did not know, and did not have reason to know, of the contact between Graham and Amber.  Thus, there is insufficient evidence from which the trier of fact could reasonably conclude that Defendants were aware of a specific harm to Amber.  See Doe, 649 F.2d at 145; see also Amnesty America v. Town of West Hartford, 361 F.3d 113, 127 n. 8 (2d Cir. 2004) (stating that the need for better or more supervision must be obvious).

Knowledge of a specific harm, however, "is not the only type of knowledge that will suffice." Doe, 649 F.2d at 145.  "Defendants may be held liable . . . if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." Id.  Under this theory, one may infer "deliberate unconcern for plaintiffs' welfare from a pattern of omission revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse." Id.  Here, however, there is no evidence of a pattern of omissions revealing inattention to potential sexual abuse of foster care placements.  As the Supreme Court stated in City of Canton, Ohio v. Harris, 109 S. Ct. 1197, 1205 (1989):

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific [employees] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible. . . if it actually causes injury.

The Supreme Court continued to note that,

> [it will not suffice] to prove that an injury or accident could have been
> avoided if a[] [government employee] had had better or more training,
> sufficient to equip him [or her] to avoid the particular injury-causing
> conduct.  Such a claim could be made about almost any encounter
> resulting in injury. . . . [F]or liability to attach . . . the identified deficiency in
> a city's training program must be closely related to the ultimate injury. . . .
> Thus . . . [the plaintiff] must still prove that the deficiency in training
> actually caused the [government employees'] indifference to [the risk of
> harm]. . . .  In virtually every instance where a person has had his or her
> constitutional rights violated by a city employee, a § 1983 plaintiff will be
> able to point to something the city "could have done" to prevent the
> unfortunate incident. . . .

City of Canton, Ohio, 109 S. Ct. at 1206.  The operative inquiry is whether the facts suggest

that the policymaker's inaction was the result of a "conscious choice" rather than mere

negligence.  Amnesty Am., 361 F.3d at 128.

Applying these principles to the case at bar, Plaintiffs have not met their burden.

There is insufficient evidence that the need for more or additional training, or additional

supervision, was "obvious."  City of Canton, 109 S. Ct. at 1205.  For the reasons previously

discussed, Plaintiffs have offered insufficient evidence that Defendants had reason to know

of the potential risk of sexual relations between foster children and St. Anne employees.  For

example, there is no evidence of a failure to respond to past complaints or incidents of

abuse.  See Amnesty Am., 361 F.3d at 128.  Plaintiffs offer no other facts tending to suggest

that Defendants were aware of a risk of harm and made a conscious choice to disregard that

harm.  In this regard, this case is quite different from Doe and Tylena M.  This case does not

present a situation where, as in Doe, government employees disregarded a physician's

report concluding that sexual abuse was occurring.  Nor is this a case like Tylena M where

the governmental agency had a policy precluding the gathering of evidence of abuse.  Aside

Case 1:03-cv-01333-TJM-RFT   Document 129   Filed 03/02/06   Page 21 of 35


from broad allegations that Defendants did not visit Amber with sufficient frequency, there is no evidence that Defendants closed their eyes to any evidence of abuse, maltreatment, or sexual relations. To the contrary, the Greene County Defendants had no knowledge, and did not have reason to know, of any sexual relations between Amber and Graham.

For the foregoing reasons, the Court finds that the Greene County Defendants did not act with deliberate indifference and that any policies, lack of policies, failure to train, or failure to supervise cannot be said to be closely related to Plaintiff's injuries. Id. at 1206. Accordingly, the substantive due process claims against the Greene County Defendants are dismissed.[15]

### c.      Fourth Amendment

The Greene County Defendants move to dismiss Plaintiffs' Fourth Amendment claims on the ground that Amber's mother consented to Amber's removal from the home and the Greene County Defendants had probable cause to remove Amber from the home. Plaintiffs have failed to respond. The Court agrees with the Greene County Defendants' arguments. Based on Amber's allegations of sexual abuse and drug use in her mother's home, Defendants had probable to cause to remove Amber therefrom. This gave rise to an emergency situation justifying the immediate removal of Amber from the home. See Tenenbaum v. Williams, 193 F.3d 581, 593-95 (2d Cir. 1999). Accordingly, there was no Fourth Amendment violation arising out of the Greene County Defendant's having taken

---

[15] In light of the foregoing conclusion, the Court has found that Plaintiff did not suffer a constitutional deprivation at the hands of the Greene County Defendants. Assuming there was such a constitutional violation, based on the above reasoning, the individual Greene County Defendants would be entitled to qualified immunity. Although it is clear that children in the care and custody of a governmental agency have a substantive due process right to be free from certain harms, under the facts and circumstances of this case, it was objectively reasonable for the Greene County Defendants to believe that their actions did not violate such rights.

custody of Amber.  To the extent Plaintiffs contend that her Fourth Amendment rights were violated when Graham "seized" her body for sexual purposes, that will be addressed below in connection with the St. Anne Defendants' motion for summary judgment.

### d.      Title IX

The Greene County Defendants seek to dismiss Plaintiffs' Title IX claim, 20 U.S.C. § 1681, on the ground that there is no evidence that Amber or her mother were excluded from or denied any benefit of any education program or activity because of their sex. Plaintiffs have failed to respond.  This claim must be dismissed.

Title IX covers discrimination on account of sex, including sexual harassment.  See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 125 S. Ct. 1497 (2005); Hayut v. State Univ. of New York, 352 F.3d 733, 749-50 (2d Cir. 2003).  Sexual abuse is a form of sexual discrimination (or harassment).  However, there can be no liability under Title IX unless a recipient to federal educational funding acts with deliberate indifference to sexual harassment or abuse.  Id.  In this case, Plaintiffs have presented no evidence that any of the Greene County Defendants are a recipient of federal educational funding.  Thus, there is no basis upon which to conclude that Title IX applies to the Greene County Defendants. Further, for the reasons previously discussed, it cannot be said that the Greene County Defendants acted with deliberate indifference.  The Greene County Defendants did not know, or have reason to know, of the sexual relations between Amber and Graham.  See Hayut, 352 F.3d at 750-51.  Once they did learn of the sexual relations, they removed Amber from St. Anne and there is no evidence of any sexual abuse of Amber occurring after the time the Greene County Defendants became aware of the sexual contact between Amber and Graham.

The St. Anne Defendants move to dismiss the Title IX claim on the ground that they are not subject to Title IX because they do not receive federal funding.  In support of this claim, the St. Anne Defendant submitted affidavits stating that St. Anne does not receive any federal funding.  In response, Plaintiffs fail to offer any evidence that St. Anne receives federal funding.  Instead, Plaintiffs argue that St. Anne receives state funding, some of which may have been derived from the federal government.  Plaintiffs' argument is conclusory and, in any event, is precluded by the Supreme Court's holding in National Collegiate Athletic Ass'n v. Smith, 119 S. Ct. 924, 929 (1999).

First, Plaintiffs have provided no evidence concerning the source of the state money paid to St. Anne.  Second, in Smith, the Supreme Court held that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not."  There is no evidence that St. Anne received federal assistance directly or through an intermediary.  Assuming St. Anne receives monies from the state that were originally derived from the federal government, it can only be said that St. Anne benefits economically from federal assistance.  There is no evidence that the federal funds were earmarked for St. Anne (or foster care).  Accoringly, St. Anne is not subject to Title IX.

### e.    Whether St. Anne Acted Under Color of State Law

The St. Anne Defendants move to dismiss the constitutional claims on the ground that they are not state actors and, therefore, cannot be held liable under 42 U.S.C. § 1983. Relying primarily on the Second Circuit cases of Perez v. Sugarman, 499 F.2d 761 (2d Cir. 1974), and Duchesne v. Sugarman, 566 F.2d 817 (2d Cir. 1977), Plaintiff contends that St. Anne is a state actor.

In American Mfrs. Mut. Ins. Co. v. Sullivan, 119 S. Ct. 977 (1999), the Supreme Court stated that

> Faithful application of the state-action requirement . . . ensures that the prerogative of regulating private business remains with the States and the representative branches, not the courts.  Thus, [St. Anne] . . . will not be held to constitutional standards unless there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.  Whether such a "close nexus" exists, our cases state, depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. . . .  Action taken by private entities with the mere approval or acquiescence of the State is not state action.

119 S. Ct. at 986 (internal citations and quotations omitted).  "[S]tate action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly said to be a state actor.'"  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 119 S. Ct. 977, 985 (1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744 (1982)) (emphasis in original).

With respect to the second requirement, we must begin by "identifying 'the specific conduct of which the plaintiff complains.'"  Am. Mfrs. Mut. Ins. Co., 119 S. Ct. at 985 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  "If a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the state.  Rather, private conduct is fairly attributable only when the state has had some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance."  NBC, Inc. v. Communications Workers of

America, 860 F.2d 1022, 1025 n.4 (11th Cir. 1988).  Here, the Complaint alleges deprivations of Amber's substantive due process rights caused by her sexual relationship with Graham. More specifically, it is alleged that St. Anne failed to prevent the sexual relationship from transpiring.  The issue, then, is whether St. Anne's failure to prevent Graham from engaging in sexual acts with Amber may be fairly attributable to the State.  See Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1348 (11th Cir. 2001) ("[B]ecause the particular conduct at issue here is child abuse, we must determine whether the State was a 'joint participant' with the [foster parents] in the context of child abuse."); see also Blum, 102 S. Ct. at 2786 ("The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.") (emphasis in original).

In Perez, 499 F.2d 761, and Duchesne, 566 F.2d 817 (2d Cir. 1977), the Second Circuit found that private child caring institutions were state actors.  In Perez, the Second Circuit found state action because the institution provided an essential and traditional public function and because "[t]he comprehensive statutory regulatory scheme of the New York Social Services Law is persuasive, perhaps compelling, evidence of the degree to which the State has insinuated itself into the actions of the private defendants. . . ."  499 F.2d at 765. In Duchesne, the Second Circuit again concluded that private child caring institution was a state actor.  In Duchesne, however, the Second Circuit relied upon the analysis in Perez and did not provide any further explanation of its reasoning.  Although Second Circuit cases are binding upon this Court, the Court concludes that the Supreme Court has markedly changed the legal landscape of this area of law such that these cases are no longer controlling.  See

Garcia v. Lewis, 2005 WL 1423253, at *6 n.68 (S.D.N.Y. 2005); In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability, 2005 WL 106936, at *4 (S.D.N.Y. 2005).[16]

The public function theory relied upon in the Perez and Duchesne cases has been substantially altered. "That a private entity performs a function which serves the public does not make its acts state action." Rendell-Baker v. Kohn, 102 S. Ct. 2764, 2772 (1982). "[T]he relevant question is not simply whether a private group is serving a 'public function.' . . . [T]he question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" Id. (quoting Jackson v. Metropolitan Edison Co. 419 U.S. 345, 353 (1974)) (emphasis in original). Thus, it is insufficient that a private entity may be serving a traditional or even essential public function. The inquiry is whether that function has been the exclusive prerogative of the state.

The record before the Court does not demonstrate that St. Anne performed a function that traditionally has been the exclusive prerogative of the state. See Robert S. v. Stetson School, Inc., 256 F.3d 159, 166 (3d Cir. 2001) (Alito, J.). For example, there is no evidence of state run foster care institutions or that the state otherwise traditionally took it upon itself to be the sole provider of foster care. New York's Family Court Act suggests that New York is not, and has not been, the exclusive provider of foster care. Many options remain available to children who are adjudicated to be in need of supervision. N.Y. Family Court Act § 754. For example, the court can enter an order "[d]ischaring the respondent with

---

[16] Plaintiff also relies upon Arneth v. Gross, 699 F. Supp. 450 (S.D.N.Y. 1988) and Whalen v. Allers, 302 F. Supp.2d 194 (S.D.N.Y. 2003). Neither of those cases are persuasive. Arneth found state action merely because "the Mission's foster care services are financed with federal, state or city funds." Arneth, 699 F. Supp. at 452. As will be discussed, the mere receipt of government monies, standing alone, is insufficient to establish state action. Whalen found state action to be present without any meaningful analysis. Rather, it appears that the court in that case simply relied upon the holding in Perez. 302 F. Supp.2d at 202.

warning;" "[s]uspending judgment. . .;" "[p]lacing the respondent in accord with section seven hundred fifty-six;" or "[p]utting the respondent on probation. . . ."  If a child is to be placed pursuant to § 756, as Plaintiffs acknowledge, "the Family Court Act allows for the child to be placed in either [her] own home, the home or a relative or other suitable person or the Department of Social Services."  Pl.'s Mem. of Law at 11-12; N.Y. Family Court Act § 754; 756(a)(I).  In this very case, once Amber was removed from St. Anne, she was returned to the home of her mother in April 2002, but not discharged from the custody of the GCDSS until November 2002.  There is, therefore, insufficient evidence in the record upon which to conclude that the provision of foster care services, or the housing of persons in need of supervision, has traditionally been the exclusive prerogative of the State.  See Arneth v. Gross, 699 F. Supp. 450, 451 (S.D.N.Y. 1988) ("New York has historically depended upon non-governmental child-care facilities for the care of children outside their homes.  As the various waves of immigrants came to New York over many decades, many of these child-care institutions operated and continue to operate under sectarian auspices.").

Perez further found state action upon the facts that the state determined whether a facility is authorized to receive children, the facility was required to consent to state inspections, the institutions was required to keep certain records, the state was responsible to supervise the children, and the state retained the right to remove children from an institution at any time.  This Court believes that, in light of more recent Supreme Court cases, these facts no longer compel a finding of state action.  It is well-settled that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment."  Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350, 95 S. Ct. 449 (1974).  For example, in Blum v. Yaretsky, 102 S. Ct. 2777,

2786 (1982), the Supreme Court held that the fact that nursing homes "are extensively regulated" did not qualify a nursing home's decision to transfer patients to a lower level of care as state action.  In Blum, the state required nursing homes to complete patient assessment forms designed by the State, and the state further had the power to inspect the nursing homes, exclude nursing homes from participating in the Medicaid program, and fine nursing homes who violated applicable regulations.  Nevertheless, the Supreme Court held these facts to be insufficient to establish state action because "[t]hese regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor do they demonstrate that the State is responsible for the decision to discharge or transfer particular patients. . . . [T]hose regulations themselves do not dictate the decision to discharge or transfer in a particular case."  Id. at 2788-89.  The Blum Court further recognized that the State of New York had the authority to conduct on-site inspections of nursing homes, which inspections could result in a discharge or transfer of a patient by state health officials.  Id. at 2788 n. 21.  The Court found, however, that the relevant inquiry is not whether the state had such power in general, but whether the specific conduct at issue implicated that power.  Blum, 102 S. Ct. at 2788 n. 21.  Because none of the many state regulations dictated the decision to discharge or transfer a patient in a particular case, the Supreme Court found that the existence of such state regulations did not transform the transfer and discharge decisions into state action.

In many ways, this case is similar to Blum.  Without question, St. Anne is subject to State regulation.  Like in Blum, here, the State has the right to inspect St. Anne, require St. Anne to prepare certain records (such as comprehensive assessments and service plans for each foster child), review case plans for the children, and to remove children from St. Anne.

Unlike <u>Blum</u>, the state also can disagree with plans prepared by St. Anne and work with St. Anne to make any necessary amendments to the plan.  However, as in <u>Blum</u>, none of the authority retained by the state implicated the manner in which St. Anne supervised (or failed to supervise) Amber or Graham.  The state did not review the daily supervision of St. Anne and it did not retain the right to do so.  To the contrary, in its contract with St. Anne, the state expressly left the "care of the child" to St. Anne.

The other evidence further supports this conclusion.  St. Anne is privately owned and operated.  St. Anne is run by its own board of directors.  There is no evidence that any St. Anne board members were appointed by a government entity or were government employees.  St. Anne was not created by the State and there is no evidence that the State (or the County) is any way involved with St. Anne's administrative or operational functions. St. Anne employees are responsible for the daily implementation of St. Anne policies and procedures.  The St. Anne programs are created and administered by St. Anne employees. St. Anne retained discretion to reject certain children.  Pursuant to the contract between St. Anne and Greene County, St. Anne is responsible for the care of the children and for determining whether the services provided are appropriate for the particular child's needs.[17] The contract further provides that St. Anne "shall have the responsibility for the day-to-day provision of foster care services for each child placed with it. . . . [H]owever, . . . ultimate responsibility for the welfare of each child rests with the Department."  As such, the daily supervision of Amber, including the failure to detect and/or prevent any sexual transgressions

---

[17] As noted, it appears that the State could disagree with St. Anne's decisions and work with St. Anne to make any necessary modifications.

by Graham, was upon St. Anne, without any coercion or encouragement of the State.[18]
There is no evidence that the state mandated or was otherwise involved with staffing levels,
the manner in which foster care placements were to be supervised, or the manner in which
St. Anne employees were to be supervised.  There is an absence of evidence that state
actors had any involvement concerning the actions (or inactions) complained of in this case
(the sexual abuse of Amber).  The manner in which children were supervised at St. Anne
was left to the judgment of St. Anne's administrators according to professional standards that
were not established by the state.  See Blum, 102 S. Ct. at 2788.

        The facts that St. Anne receives funding from the State of New York or that a
significant portion (if not all) of St. Anne's clientele comes through state actors also does not
transform it into a state actor.  Rendell-Baker, 102 S. Ct. at 2771(Holding that financial
dependence upon the state does not make the acts of private actors state action and further
stating that "[a]cts of . . . private contractors do not become acts of the government by reason
of their significant or even total engagement in performing public contracts.").  Further, like in
Polk County v. Dodson, 454 U.S. 312 (1982), and Rendell-Baker, "the relationship between
the school and its [students] . . . is not changed because the State pays the tuition of the
students." Id.  Stated otherwise, regardless of the source of funding or any state regulations,
St. Anne used its own professional judgment in supervising the children in its care.  Again,
the particular conduct under consideration in this case pertains to the general supervision of
Amber while she was at St. Anne, including the failure to identify Graham's sexual activity

---

[18] In fact, the arguments Plaintiffs make in support of their substantive due process claim against the Greene County Defendants support the conclusion that St. Anne was not a state actor.  Plaintiffs complain that the Greene County Defendants did not have daily contact with St. Anne, did not actively supervise Amber, etc.  These facts support the conclusion that the state was not intertwined with St. Anne's activities in supervising Amber and/or Graham.

with another student, Carla S., the failure to earlier identify Graham's sexual activity with Amber, and St. Anne's failure to take appropriate action to prevent sexual contact between Graham and Amber.  The state did not encourage Graham's conduct and it similarly did not encourage, either overtly or covertly, St. Anne's failure to prevent Graham's sexual contact with Amber.

The fact that the Greene County Defendants placed Amber at St. Anne does not alter the result.  This Court agrees with, and adopts the reasoning in, the Third Circuit cases of Robert S., 256 F.3d 159 and Leshko v. Servis, 423 F.3d 337 (3d Cir. 2005).  The facts of Robert S. are nearly identical to those involved here.  The plaintiff in that case, Robert, was a victim of sexual abuse.  A Pennsylvania court found Robert to be a "dependent child"[19] and placed him, with his mother's consent, in the temporary custody of the Philadelphia Department of Human Resources ("DHS").  DHS determined to enroll Robert in a private residential school specializing in the treatment and education of juvenile sex offenders. Robert alleged that staff members of the school subjected him to physical and psychological abuse.  In a thorough analysis, which this Court fully adopts, the Third Circuit concluded that "the [school's] receipt of government funds did not make it a state actor.  Similarly, although Robert relies on the detailed requirements set out in DHS's contracts with [the school], those requirements are also insufficient because they did not 'compel or even influence' the conduct on the part of the [school's] staff that Robert challenged."  Robert S., 256 F.3d at 165.  The Third Circuit further concluded that the school was not performing a function that

---

[19] A finding that a child is a "dependent child" under Pennsylvania law is akin to New York's person in need of supervision ("PINS") under Article 7 of the Family Court Act.  Both a "dependent child" under Pennsylvania law and a person found to be in need of supervision under New York law are distinguishable from persons who have been adjudicated as delinquent children.

had traditionally been the exclusive prerogative of the state, and the fact that a state statute may have required that the services be provided did not alter that conclusion.  256 F.3d at 165-66; see also Rendell-Baker, 457 U.S. at 842 ("That legislative policy choice in no way makes these services the exclusive province of the State.").

The Third Circuit continued to address the argument that Robert's placement at the residential school by state authorities made his situation analogous to that of a prisoner. Robert S., 256 F.3d at 166; see West v. Atkins, 108 S. Ct. 2250 (1988).  The Third Circuit concluded that Robert was not placed involuntarily at the school because his legal custodian, DHS, wanted him placed there, his mother consented, and the many freedoms Robert enjoyed while at the school distinguished his situation from that of a prisoner.

As can be seen, the facts in this case are quite similar.  Amber was the victim of sexual abuse.  With her mother's consent, Amber was placed into the temporary custody of the GCDSS.  Although a court ultimately directed the GCDSS to take custody of Amber, there is no indication in the record that Amber's mother objected.  Amber's temporary custodian, the GCDSS, placed her at St. Anne.  There is no evidence in the record that Amber's mother ever objected to that placement.  As with the school in Robert S., here, St. Anne is a private organization.  As previously discussed, although St. Anne receives state funding and is subject to state regulation and the obligations set forth in the contract between GCDSS and St. Anne, those requirements did not compel or influence the conduct (or lack of conduct) on the part of St. Anne that Plaintiffs challenge.  Furthermore, as in Robert S, Amber was not adjudicated as a delinquent and was not specifically placed by court order at St. Anne.  Rather, she was placed in the temporary custody of the GCDSS which, after unsuccessfully trying less restrictive placements, opted to place Amber at St. Anne.

Moreover, as in <u>Robert S.</u>, it appears that Amber retained significant liberties while at St. Anne.  Although there is little evidence in the record on this subject and Amber clearly was subject to certain restrictions while at St. Anne, the evidence indicates that Amber was permitted contact with her family and was permitted to go home for vacations.  "Thus, [Amber's] enrollment at [St. Anne] was not 'involuntary' in the sense relevant here, i.e., [s]he was not deprived of [her] liberty in contravention of [her] legal custodian's (or his mother's) wishes."  <u>Robert S.</u>, 256 F.3d at 167-68.  Accordingly, "[t]here is . . . no factual basis for analogizing [Amber's] situation at [St. Anne] to that of a prisoner or a person who has been involuntarily civilly committed," thereby distinguishing this case from <u>West v. Atkins</u>, 108 S. Ct. 2250 (1988).

        In conclusion, the manner in which Amber was supervised, the failure to detect sexual contact between Amber and Graham, and the failure to take appropriate action upon discovering the sexual relationship between Graham and Carla S. was "not compelled or even influenced by any state regulation" or other state action.  <u>Rendell-Baker</u>, 102 S. Ct. at 2771.  Plaintiff has pointed to insufficient evidence demonstrating any active involvement by the state or the county in the supervision of Amber or any other students at St. Anne.  In fact, Plaintiff has argued to the contrary - that the County failed to actively involve itself in the supervision of Amber or in identifying any problems with Graham.  <u>See</u> <u>id</u>.  The conduct complained of in this case was neither at the direction of the State nor encouraged by the State.  Plaintiffs have pointed to insufficient evidence demonstrating that the State of New York or the state actors exercised coercive power over St. Anne, provided significant encouragement to St. Anne's conduct towards Amber, or otherwise had a sufficient nexus to St. Anne's actions to classify St. Anne as a state actor.  There is no indication or evidence

that the State encouraged or permits the sexual abuse of foster children or that the State

encourages or permits foster care providers to ignore, fail to investigate, or fail to report

incidents of child abuse.  The Court, therefore, concludes that St. Anne is not a state actor

under the facts and circumstances presented in this case.  See Rayburn ex rel. Rayburn v.

Hogue, 241 F.3d 1341 (11th Cir. 2001) (foster parents of children who were alleged to have

been sexually abused while within the custody of the foster parents were not state actors);

Simescu v. Emmet County Dept. of Social Services, 942 F.2d 372 (6th Cir. 1991) (private

social services entity was not a state actor with respect to allegations of sexual abuse);

Milburn v. Anne Arundel County Dep't of Social Serv., 871 F.2d 474, 477-79 (4th Cir. 1989)

(in action against foster parents alleging abuse and failure to report abuse, the court held that

foster parents were not automatically state actors where "the State [had not] so far insinuated

itself into a position of interdependence with the [foster parents] that it must be recognized as

a joint participant in the challenged activity"); Malachowski v. City of Keene, 787 F.2d 704,

710 (1st Cir. 1986) (per curiam ) (holding that a private organization that provided foster

homes for state agencies was not a state actor, where at "no time did [the private

organization] assume the state's mantle of authority").  Accordingly, St. Anne may not be

held liable under 42 U.S.C. § 1983.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that the Greene County Defendant did not

violate Plaintiffs' substantive due process rights; the Greene County Defendants are not

subject to liability under 20 U.S.C. § 1681 and, assuming they are, they did not act with

deliberate indifference; the Greene County Defendants had probable cause to remove

Amber from her home; St. Anne is not subject to 20 U.S.C. § 1681; and St. Anne was not a

state actor.  Plaintiffs have withdrawn their claims under the Fifth and Eighth Amendments,

under the procedural due process clause of the Fourteenth Amendment, and under 42

U.S.C. § 1981.  Accordingly, all federal claims have now been withdrawn or dismissed.  The

Court declines to exercise supplemental jurisdiction over any remaining state law claims.

The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated:March 2,2006

Thomas J. McAvoy
Senior, U.S. District Judge